May it please the court, Gerald Sevilla on behalf of the appellant Paul Tanaka. This sad story begins with the last day of the Smith trial in which the trial court admonished the half a dozen or so defendants that there was no evidence in that trial involving those multiple defendants that they received orders to obstruct justice, move the inmate Andrew, Mr. Brown around to avoid FBI contact or otherwise. So that was the state of the evidence where those defendants had every incentive to show orders from on high directing them to do things that were obstructing. The judge found there was no such evidence in sentencing them. So now we go to under Sheriff Tanaka's case and in order to prove established content to the allegations of obstruction of justice, the government went to extraordinary lengths in cross-examining Mr. Tanaka while he was on the stand by alleging multiple times that he was a member associate of a gang of lawless deputies that operated out of the Linwood substation in Los Angeles. Now the intent of the government in proving that was, or trying to prove it, was to show that if Mr. Tanaka was a member of a lawless gang engaging in civil liberties violations and other lawless conduct as they stated, that would show specifically conduct of protecting other officers who engage in misconduct. That's part of what they were doing, right? Well, what they said they were doing is by showing membership, we will impeach his testimony that he was living up to the core values of the sheriff, which were essentially integrity and lack of racism in the conduct of business. Right, because this organization, one of the things that they did is to try to protect other officers who commit misconduct, which was directly contrary to what Mr. Tanaka testified he was. This organization for which there was no proof was deemed in 1991 in a reversed district court finding that it was a white racist subcategory of deputies in the Linwood station. This court reversed that finding because the sheriff's department in LA County produced 1,200 pages of conflicting declarations and other documents at the time, and this court in the Thomas case said half a hearing, they reversed that. Yet that is what the prosecution in this case used to try to establish a gang of deputies operating out of Linwood in 1990-91 that Appellant was associated with. Appellant denied that he was ever a member of such a gang. Appellant is Japanese by descent, married to a Chicano woman. The idea that he's going to belong to a gang of white racists in the Linwood station is on its face absurd. But there was no, more importantly, there was no proof of this. This was strictly through cross-examination and perhaps in a record for redundancy on one page of the ERs, the prosecutor asked Mr. Tanaka seven times, what about the lawless gang? What about the findings of the lawless gang in Linwood? And he said, I don't know of any such thing. I was not a member of the lawsuit, number one. I was not named in it. I was not a party to it. I didn't read it. So I don't know what you're talking about. And then the prosecution kept out it for 10 pages saying, well, you have a tattoo of the Linwood station Viking, correct him. And Mr. Tanaka said, without contradiction, yes, that was the substations mascot, just as Norwood had a mascot and other substations had mascots and we use them. And we had intermural sports competitions of which he participated. We were the Linwood mass Vikings. They were the Norwood Panthers or whatever. So again, no contradiction to that. But the jury is given this deluge of district court findings that there was a gang, a lawless gang engaging in civil liberties violations and other unstated misconduct. That's part of the cross-examination too. So despite the fact there's no evidence, there's lots of prosecutorial statements that this occurred. This jury never heard that these findings were reversed for lack of an evidentiary hearing because all of the findings were contested by the defendants in that case. So what precedential value is there? What basis is there for making that a legitimate basis of cross-examination? A reversed finding by a district court lacking an evidentiary hearing. Was the ACLU report admitted? Yes. And it focused on the first eight months of 2010? Actually, I think the ACLU reports go back. They undoubtedly included 2010, but they went back to, I think, 07, 08, 09. And as of 2005, Mr. Tanaka was assistant sheriff, right? Not deputy sheriff, but assistant sheriff. Well, he was in charge, and I've cited a number of times what he was in charge of for the seven years prior to his elevation. Well, it includes oversight of the men's central jail. No. As of 2005, I think it did cancel, according to this report. And then for a period of time it didn't, and then it did again, according to this report. Does that sound wrong? It sounds wrong. I know Mr. Tanaka testified that in his career he was promoted to chief 2002 to 2007. His primary responsibility was the budget. And then at 123, he was assistant and assistant sheriff for six and a half years from 07 to 2011 to oversee 23 patrol stations. Right. And he was asked specifically, not overseeing the men's central jail, he said, that's correct. That was... And my question, counsel, went to the period between 2005 and 2007, and he was overseeing the jail at that time, was he not? He was... Well, his testimony was his primary responsibility from 202 to 207 was the budget, because he is a CPA. And that's at pages 121 and 122 of his testimony. I don't believe he had command responsibility of the MCJ, the men's responsibility. And that was not Mr. Tanaka's. In any event, the... Your honor alluded to the, quote, historical information that came in of these reports and unprecedented avalanche of dozens of scores of inmate declarations about misconduct. Well, he wasn't in charge of the central jail, and I'm not sure how that leads one to believe that he is committing an obstruction of justice in following orders of his boss, the sheriff, to get to the bottom of the smuggling of the cell phone. Remember, this conspiracy allegedly went from August 18th or 19th until September 25th. And during that period of time, the FBI and... Changing his name. Changing his name, correct. So is your first argument... I think it's sort of lumped together, the evidence of the Viking tattoo and that it wasn't removed, membership or not in the deputy gang, and what you're calling this avalanche of evidence. Essentially, I think your argument is a 403 argument that there was a due process violation because... And because on cross-examination, he was confronted with questions about findings that were later vacated. Is there anything else I should be lumping in that first basket? Well, we're talking about membership in a lawless gang of deputies. You've got gang evidence, but nothing could be more pernicious to somebody on trial for obstruction of justice than being a member of a lawless gang of deputies, which he was not. And as he said, he was not. And there was no proof that he was. But this is... He did testify, didn't he, in 2012 that the Vikings had taken on a sinister nature? He said that reputation was given to the Vikings. Not that he agreed that... What he said was the Vikings were simply the mascot of the categorization of the Vikings was the prosecution arguments and other arguments made against them. And there may well have been a limited number of deputies there who committed misconduct. But counsel, you're really not going to the question. The question is, at the Citizens Commission, at that time when he testified in 2012, did he not testify that as of that time that the Vikings had taken on that connotation? Not whether it's right or not, but that it had that public perception? Well, he would have disagreed with that if he said it. I'm sure it did take on a sinister connotation because of the publicity about it. That's what we're asking. Yes. But that doesn't mean it was true. And it doesn't mean it was evidence supportive of these questions of him that he belonged to a gang of lawless deputies. So with respect to the prejudice from that, which I would think is inherently prejudicial to say somebody belongs to a gang of lawless deputies. This court said in Kennedy versus Lockyer, which I quoted, that almost any evidence about a gang membership is going to be prejudicial. The question, of course, it's going to be prejudicial. Is it properly prejudicial because it's relevant or is it inadmissible because it's guilt by association evidence, as it was in this case? Secondly... Well, I don't think you would, whatever the use of the word, there's a difference between the kind of gang that people are used to of the kind of gang they're afraid of, the Salvatore, whatever, the M13s, and a group of sheriffs who don't enforce civil rights. Even though some may call them a gang, I don't think you can transport cases on the prejudicial nature of the word gang. In fact, some people, even in high authorities, encourage the police to violate the rights of defendants. So I think not the average juror would feel that calling a group of police members of a gang, I don't think they'd equate that in any way with the ordinary prejudice of gangs. Now, that's not disagreeing with your ultimate argument, but I would not equate the fact that a sheriff may be a member of a group that does not respect civil rights with the ordinary prejudice that arises from the use of the term gang. Well, all I can respond by saying is that the repetition that the prosecution made of this finding of a gang membership was used for its toxicity purpose. Because your client put his character in issue. Usually these cases come up where the defendant is just sitting there and the prosecution has detained him by saying he's a gang member. But this isn't what happened here. Your client testified and he basically said he's a Boy Scout. He's a guy who enforces the law and scrupulously respects the rights of prisoners and so on. So the prosecution was cross-examining him. There's great latitude in cross-examination. He tries to show he's a good guy and they are testing this by asking him about membership in this organization. Now, talk to me about the tattoo. What's the story with the tattoo? The tattoo was the mascot. It was a Viking. It was the mascot of the station. So he had the tattoo, right? He had the tattoo, yes. As did another witness who testified for the Sheriff's Department. He had a tattoo as well. They put tattoos of the mascot of the station and that's what appellant testified to and there was no, again, no contradictory evidence. But the prosecution doesn't have to believe that. The prosecution has evidence that in fact this is an organization with a nefarious agenda. Why are they entitled to ask him about it? Well, they shouldn't have. This was 403 material as the defendant objected. But it's not even evident. These are questions. These are questions. 403 can object to admission of evidence, but they're asking him questions about his membership in the organization. Why are they entitled to test that? He can say no. He can deny it. It was irrelevant as the court... How could it possibly be irrelevant? He puts his character into issue and they want to say, look, but you're a member of this organization. Tell us about this organization that in fact whose mission it is to violate the rights of prisoners. So the question would be what's the good faith in asking a question about an organization when the basis for that decision... He's got a tattoo for crying out loud. He had a tattoo of the mascot of the organization. That's his explanation. Right. That's his explanation, but there is... Certainly there is ACLU report. There are those findings. From 91, there is an ACLU report. Why isn't that plenty to provide good faith basis? That wasn't the argument for the good faith basis. It was the judge's findings which were hammered into this jury that a judge found this to be a lawless gang. What could be more detrimental than a jury hearing that a judge has found this lawless gang to have existed? Did anyone say that the district court's findings have been reversed? No. It was said during the colloquy between the court and the prosecution getting this evidence in because the court said, what's your good faith basis? They said, the district court's findings. Then the court said, well, those were reversed. They reversed because there were contested declarations and evidence by the other side, which the court never considered an evidentiary hearing to make findings. We understand that part. Was the defense not allowed to tell the jury that the findings were reversed? No. There was no preclusion of that. But, counsel, 403, the question is what's unfairly prejudicial. As this district court judge ruled, he said, the problem is you put him on the stand. So your client took the stand and he read the core value statement to the jury. He testified to his personal philosophy. He said, you have to have an unwavering sense of right and wrong. I had no tolerance, he said, for deputies who wore the badge and violated the law and on and on he went. So what's unfair about the prosecutor getting up and going through these reports? They had the ACLU report from this period of time. There's the tattoo. You say there's no evidence on the other side of the scale. But for cross-examination, there's very fertile ground. Well, what I'm arguing is that the repeated pounding in on cross-examination about him being a member of a lawless gang was not proven. And it was not only not proven, it was based on findings of a court, which the jury never heard about because the prosecution never should have been allowed to bring this up about court findings, but they did. And the jury is left with the belief, though. Why was the jury left with that belief? What prevented the defense counsel from bringing out that those findings were reversed? Well, then we have gotten into a case of, I guess, civics lesson on what it means for an appellate court to reverse findings and the jury to understand that the findings that the court made were all contested and that this court reversed those findings because of the lack of an evidentiary hearing to air out what was true and what was false. And your position, essentially, is you think a jury wouldn't have understood that? I think it should never have been required to have happened because they should never have been hearing about a judge's findings. And I might add that in this case, it was used to show intent to commit the obstruction. It was not just character evidence. It was used as intent. So gang evidence used as intent. This court has said gang evidence is not evidence of intent, but the jury was instructed that. And this court said in Garcia and in Kennedy v. Lockyer that it is not admissible for intent. Then it was also used as 404B evidence. Despite the fact that the defendant said, I've not been a member of any such gang, the prosecution got an instruction and they defended in their respondent's brief that this was 404B evidence. Well, where's the 404B evidence showing that he was a member of this gang committing civil liberties and other lawless conduct? The And that was not shown as well. So those instructions compounded the air of bringing this entire subject. That is, it was used for intent and it was used at 404B evidence to say that his other bad acts helped show intent. And last, of course, the prosecution argued in its first statement to the jury that the and claimed to stand for the core values, all the while brandishing a tattoo of a deputy gang. There was no evidence that that was a tattoo of a deputy gang. Where's the evidence? Yet that's what was argued that this, to make it clear that the prosecution was saying there's evidence that he belonged to a deputy gang and was wearing that tattoo. But the prosecution argued it as evidence. And there was an objection? There was no objection. But it is evidence of the prejudice of bringing, allowing this whole area to come into evidence to contaminate the case. I know it was argued in the first paragraph of the prosecutor's statement. Was it argued at any other parts of the prosecutor's statements or was that it? That was it. That was the opening line. And as Justice Roberts said in a recent case, it may have been brief, but the toxicity was potent and undermined, helped undermine in this case, the entire case. Why then wasn't there an objection if it was so toxic? Well, I suppose because the court overruled. It could have been corrected. It could have been withdrawn. Well, it would have been overruled because the court allowed this evidence in. The court said this is relevant. His objection was otherwise. The objection was that there was no evidence that he belonged to a gang. And yet it was raised in the summary even though there was no evidence. It's one thing to say that he was asked about it across examination. But I thought you were making a different point. The point was, and then they tagged him with it without actually providing any proof. Yes. Those are two points. Should have brought it up and made it into evidence. So that could have been objected to. He's being tagged with being a member of the gang when there's no proof. That could have been objected to. That was the nature of the written and oral objections that the appellant made and argued to the court. The court said his membership in this gang is relevant. So they had no basis when the prosecution capitalized on that ruling and made the argument. And they did. And it was Should I reserve a few minutes? Yes. Thank you. Good afternoon, Your Honors. May I please the court, Graham Alden for the United States. Defendant was convicted of obstructing justice by interfering with a All of the factual claims that he makes in his appellate briefs are claims that the jury obviously disagreed with. The legal claims are claims that this court in a motions panel already considered and held to not even raise a substantial question that was fairly debatable for purposes of appeal. The principal issue on appeal, the question of whether the government was entitled to ask questions of the defendant regarding his affiliation with the Vikings. The defense arguments are incorrect on both the score of relevance and good faith basis. As to the good faith basis, as the court has already pointed out, the government, the standard is quite low. And there's a reason for that. This is cross examination. And the government is not entitled under Rule 608B for impeachment purposes to bring in the evidence that would support or extrinsic evidence that would prove the questions that are asked and the answer that the defendant gives. That was established at this trial before the questions were even asked that the government would not and could not bring in extrinsic evidence. So when defense counsel points out that there was no evidence brought in at trial of these allegations, that is because that is what the rules require, and that actually minimizes any prejudice to the defense. There was no judicial finding put before the jury. What was the 404B ruling? The 404B ruling was that it was also admissible for purposes of proving motive or intent. And I do believe the district court used the word intent. The district court ruled that it was admissible for both the purposes of proving intent and for proving, or for purposes of impeachment and proving bad character after the defense opened the door. What was admissible for purposes of proving intent? So the intent theory was that the defendant would have obstructed a federal investigation into civil rights violations because he was affiliated with a group that had committed civil rights violations and therefore would have an incentive or a motive to protect other officers, to protect himself, to protect the sheriff's department from being discovered and from these... It was proving that he was a member of the gang. And I think that that actually goes to show, Your Honor, that if the government had sought to, under Rule 404B, maybe it could have introduced this evidence, but that would have exacerbated any alleged prejudice. No, it would, but I wondered what the 404B ruling, what was the effect of that? So the effect... I understand your question, Your Honor. The effect would have opened the door to that, but it didn't actually. So the effect was really nothing. The government didn't attempt to introduce the evidence to prove it up extrinsically, but I think the controlling case that the government cites here is Mendoza-Prado, and that was a case in which this court held that for 404B purposes, that the government could bring in the evidence. And I believe there's a number of cases, obviously, under 404B, where the all that was asked were questions. But if you bring in the evidence, it can be rebutted, it can be contested. Just sort of asking questions is, in a way, doesn't give the defendant a chance to rebut the evidence or the implication of the questions. I certainly don't think that the defense wanted or would have appreciated had the government brought in the evidence here. I think that, as the Court has pointed out, as Your Honor, Judge Kaczynski has pointed out, the defense had, and as Judge Christin pointed out, too, an opportunity on redirect to ask, well, were these findings that the government is referring to reversed? And I would say, though, as to that point, the findings themselves were not reversed. What was reversed was a preliminary injunction that was entered in a civil suit. And those findings that the district court made in the Thomas case were based on nearly 100 declarations from individuals in the community who had been subject to abuse at the hands of the Sheriff's Department. And in addition, the plaintiffs in that case brought forth 33 photographic images to show that they had been abused. And there were actually a lot of underlying declarations and facts that supported those findings. Counsel, you're going beyond anything the jury heard now, right? You're going quite beyond. Yes. Yes, Your Honor. I can certainly stick to the record. I think that that establishes, though, that the government had a good faith basis, which was what was discussed before the court, before the government asked any of those questions, and that the district court said had to be established. And that the defense, of course, did not object to on good faith basis grounds. The defense only objected on relevance grounds. How much of this is included in the ACLU report that was admitted? I don't know the extent to which this is discussed in the ACLU report. I do know that, indeed, it does point out that the defendant was in charge of jails during a two-year period from 2005 to 2007, and that, of course, he then became the undersheriff in June of 2011, but that there was a window of time during which he would have been and had oversight over Men's Central Jail. And a window of time when he did not. Yes. That is correct. So, as to the prejudice here, the defense argues that it was hammered and hammered, but really, all that the government wanted to establish here was, did the defendant belong to the Vikings? Did he have a Vikings tattoo? Was he aware that there were findings made in 1991 that the Vikings were involved in civil rights abuses? And did the defendant then remove his tattoo or not? The answers to those questions were, yes, I have the tattoo. Yes, I became aware of those findings. No, I did not remove the tattoo. So, to the extent there was any question as to the factual basis, the defendant's own answers established that those facts were, indeed, all true. The defendant denied, of course, that the Vikings were a lawless gang, but he admitted what was true, that a court found that to be, and that his reaction was to keep the tattoo from that gang. In addition, the government did not try to taint the defendant with the most toxic of the district court's findings in the Thomas case. The government did not refer to the white neo-Nazi, white supremacist gang finding. The government did not refer to the finding about, I believe it was gang, violent gang-like, sorry, terrorist-type tactics. And those findings would have been probably a lot more prejudicial than what was actually brought forth. The other thing I would point out is that the record indicates that the government initially asked about, were there findings in 1991, and did not even say judicial findings, did not say a court's findings. And the defendant's response, and this is at GER 328, was, I believe that was in a civil lawsuit, that I was not a party to, sir. So, the first time there's even a mention of the fact that these findings come from a suit is from defendant's own mouth. Under those circumstances, the asking of the question, which, as Judge Kaczynski points out, is not itself evidence, was certainly permissible. The evidence that came in was only the defendant's answers. And under any rule or any analysis of any prejudice here, it's what the defendant said. It's not what the government asked that's at issue. Finally, I would say, for purposes of harmlessness and the plain error standard or abuse of discretion standard, the evidence in this case that the defendant committed this crime was indeed overwhelming. There were 25 government witnesses. They testified about the whole course of events between June, July, August, mostly August of 2011 and September of 2011. And they established that the defendant was in charge of an inmate informant from the government, and to threaten an FBI agent with arrest to try to stop her from pursuing her investigation. So, unless the Court has further questions about that, or any of the other issues? Was the defendant asked about whether he was a member of the Vikings? Yes, Your Honor. And what was that question and answer? He acknowledged and admitted that... You may have said it, but I thought you skipped over that. I thought you asked him about the tattoo and the findings, but not about membership. Maybe I just missed it. So, I think that his response was, to these questions that the government asked, was that the Vikings were not even a group that anyone needed to be admitted to, and that it was, in fact, just a mascot of the Linwood Station where he was working in the early 1990s. But he acknowledged that he, in fact, had the tattoo, and would have identified himself as a member of whatever group the Vikings apparently were or were not. Excuse me, but I don't have the closing argument here. Could you just remind me, what was it the prosecution said at the beginning of the argument? Yes, Your Honor. It was that the defendant sits here as a member of a deputy gang. And I think what's interesting and significant is that the closing argument didn't even say a deputy gang involved in civil rights violations or abuses. It merely said a deputy gang. To the extent that the defendant acknowledged that he was part of a group of deputies and that he had a tattoo on his ankle of the Vikings, that was true. He was part of a group of deputies. Well, that's not the same thing. He's part of a deputy gang. And that was all you chose to open up, open the prosecution's argument. Do you think that was a wise judgment? In the judgment of the prosecutor who was at trial, I think that he was pointing out that he was indeed a member of a deputy group. No, not a deputy group, a deputy gang. Yeah, of course, Your Honor. And I think that what, Judge Reinhardt, you asked of defense counsel is important here is that this is not the same as a criminal street gang. And the word gang may have been inappropriate and convenient, but unfortunately, there's not really many words to describe a group of that nature. Well, but counsel, to be fair, I'm not sure you're remembering the testimony correctly. There's a question. Mr. Tanaka, when you were a sergeant at the Linwood Station, you were invited into this group, correct? Answer, I wouldn't qualify that as any invitation into any group. Question, you were asked to be a member of the Vikings, correct? Answer, I was not asked to be. There was no membership into the Vikings. The Vikings were a mascot symbol at the Linwood Station. And then he goes on to talk about the softball team. Is there another place in the record, other evidence that I should be considering? If you would just give me one moment, I'm looking at the portion of the transcript that you read from, Your Honor. You bet. 86. Right. And... You used, or somebody, the prosecutor used the word gang on 87. You, as you sit here today, are aware of that finding that in 1991, the Vikings were a deputy gang, correct? Right. And I think that, I apologize, go on. Not at all. The answer was, I may have been aware of it at that time. I don't have a specific recollection that that was the finding. So I think it's true that the defendant tried to characterize the Vikings as something other than a group or a gang or a clique. But he did acknowledge later in that questioning, and I apologize, but I'm looking at the government's excerpts of record on page 330, where he acknowledges that he has a tattoo of the Vikings, and that it's the only tattoo he has, and that... And he never had it removed. Correct. And you obtained a Viking tattoo at the time that you were a sergeant at Linwood, is that correct? Yes. You remain, well, you kept that Viking tattoo even after learning about the finding in that civil lawsuit that the Vikings were a gang, correct? And then, sorry, the question is correct, and then the answer is, sir, at that time that I received the tattoo and the time that I was at Linwood Station, there was nothing sinister about that symbol. So I think it's a fair inference from the testimony that the defendant thought of himself as part of a group, whether or not he wanted to acknowledge that it required an invitation to be a member or even was a group or a gang, that he got a tattoo, that he was affiliated with other people who had similar tattoos. It would be nice if the prosecution would just try cases on, if you've got such a great case, why don't you try it instead of trying to prejudice a jury by saying that somebody's a member of a gang, when you haven't tried to prove he was a member of a gang, and then you start out your argument saying this is a really bad guy, he's a member of a gang. I really find that offensive, if nothing else. Your Honor, I think we all in my office hold ourselves to a high standard and would always love to achieve that standard and really strive towards that. I think this is a case in which the defendant opted to take the stand and put his character at issue. It doesn't mean that you proved that he was a member of a gang. What the question is... You asked him questions legitimately about that, and you got answers, but you didn't try to prove he was a member of a gang, did you? No, Your Honor, and I think that that would have actually... Well, if you didn't try to prove he was a member of a gang, then why do you start out your closing argument by saying he was a member of a gang? I would submit that the defendant's acknowledgement that he had a tattoo that was affiliated with the station where he worked, whether or not he wanted to characterize it as a gang, was an acknowledgement of the fact that he was a member of that gang. It's discouraging to see the prosecution engage in that kind of tactics, whether it's Brady violations, whether it's an attempt to prejudice a jury by accusing someone of being a member of a gang when you never tried to prove it. I know your Your Honor, I understand your concerns. I would only say that this was a case in which the defendant was alleged to have conspired with others to obstruct an investigation into civil rights, and that when he made his defense about his good character and the fact that he would never stand for deputy misconduct, he opened the door to that issue, and I do understand the court's concern. Thank you. Thank you, Your Honor. I understand it's been a long morning for the court, so I'll participate in stating the cliché. I'm going to be brief, but I have to answer the allegation that the court's bail motion ruling is somehow authoritative to this court. A bail motion denial means nothing more than bail has been denied. There was no full briefing. There was no oral argument, and I'm not here arguing the validity or invalidity of the motion panel's decision on bail. I'm here arguing that my client didn't get a fair trial down below, and that's what's before the court. I believe I heard counsel state that under Mendez-Prado, the prosecution can produce extrinsic evidence under 404B, but as has been noted, they didn't do it, yet argued that Appellant, despite the lack of evidence that he was ever a member of a lawless gang, argued it to the jury as their opening salvo in argument, and the record reflects that at ER 26. There was evidence that he was a member of this organization. He had the tattoo. He has an explanation for it. What there isn't evidence for is that this was a gang, and then we get into the epistemology of what gang means, and I agree with Judge Reinhart that it's a strong term, and probably strong enough that it wasn't supported by any actual evidence, but membership was not unsupported. Whatever the thing is, organization, or if you call it a boys club, or whatever you want to call it, membership was, there was evidence of membership. No, there wasn't. He said, I was a member. There was the tattoo, and your client had an explanation for that tattoo, said, oh, I just did it because it's a mascot, but the jury doesn't have to believe it. The government doesn't have to accept that. People don't, I mean, it's entirely plausible to believe that you don't put a tattoo on yourself unless it's a sign of membership. He said he was a member of the Linwood Station. The membership of the Linwood Station included the mascot of the station, which was a Viking. That's as far as he went. He didn't say, I was a member of any lawless gang that operated. I understand, and that's his position, but that is not the only inference one can draw from the tattoo, and he did admit to the tattoo. He did admit he had a tattoo, and there was nothing sinister about that, and they didn't prove otherwise. I think we've beat the issue sufficiently. I will retire from the field. Thank you very much for your attention. Thank you, counsel. Thank you both very much. The case will be submitted.
judges: Reinhardt, Kozinski, Christen